

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00165-CV

IN THE INTEREST OF S.D. AND
I.D., CHILDREN

----------

### FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
### TRIAL COURT NO. CIV-13-0953

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.S.D. (Mother) appeals from the trial court's termination of her parental relationships with S.D. and I.D., Daughter and Son, ages six and four respectively at the time of trial. Father B.D. does not appeal from the trial court's termination of his rights. Mother does not challenge one of the grounds of termination on which the trial court based its judgment, but she does challenge

---

[1]See Tex. R. App. P. 47.4.

the sufficiency of the evidence supporting the trial court's best interest finding. Because we hold that the evidence is legally and factually sufficient to support the best interest finding and therefore termination, we affirm the trial court's judgment terminating Mother's parental relationships with the children.

**No Challenge to Failure to Comply with Court-Ordered Service Plan**

In three issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment and best interest findings.[2] But she does not challenge the sufficiency of the evidence supporting the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than nine months as a result of their removal for abuse or neglect.[3] Along with a best interest finding, a finding of only one ground alleged

---

[2]*See* Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001(b)(1)(D)–(E), (2), 2015 Tex. Sess. Law Serv. 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001). Termination provisions in family code section 161.001 hereinafter will be cited as they will appear in the amended family code section.

[3]*See id.* § 161.001(b)(1)(O).

under section 161.001(b)(1) is sufficient to support a judgment of termination.[4]
We therefore do not reach the merits of Mother's first two issues.[5]

**Legally and Factually Sufficient Evidence of Best Interest Finding**

In her third issue, Mother contends that the evidence is legally and factually insufficient to support the best interest finding.

### Standards of Review

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the best interest ground was proven.[6] We review all the evidence in the light most favorable to the best interest finding and judgment.[7] We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.[8] We disregard all evidence that a reasonable factfinder could have disbelieved.[9] We consider undisputed

---

[4]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[5]*See* Tex. R. App. P. 47.1; *A.V.*, 113 S.W.3d at 362; *In re E.A., Jr.*, No. 02-12-00418-CV, 2013 WL 1234867, at *1 (Tex. App.—Fort Worth Mar. 28, 2013, pet. denied) (mem. op.).

[6]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2).

[7]*J.P.B.*, 180 S.W.3d at 573.

[8]*Id.*

[9]*Id.*

3

evidence even if it is contrary to the finding.[10]  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[11]  "A lack of evidence does not constitute clear and convincing evidence."[12]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province.[13]  And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[14]

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship.[15]  In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[16]  We determine whether, on the entire record, a

---

[10]*Id.*

[11]*See id.*

[12]*In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

[13]*J.P.B.*, 180 S.W.3d at 573, 574.

[14]*Id.* at 573.

[15]*In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

[16]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

4

factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child.[17]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[18] We review the entire record to determine the child's best interest.[19] The same evidence may be probative of both the subsection (1) ground and best interest.[20] Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

---

[17]Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[18]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[19]*In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

[20]*Id.* at 249; *C.H.*, 89 S.W.3d at 28.

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[21]

These factors are not exhaustive; some listed factors may be inapplicable to some cases.[22]  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[23]  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[24]  That is, "[a] lack of evidence does not constitute clear and convincing evidence."[25]

**Mother**

Mother never tested positive for drugs during the case, had completed parenting classes twice, and had also taken anger management classes.  She had obtained employment, and she had missed only two visits with the children during the entire case.  It was clear that she and the children were bonded and loved each other.  But TDFPS's overlapping concerns about returning the

---

[21]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

[22]*C.H.*, 89 S.W.3d at 27.

[23]*Id.*

[24]*Id.*

[25]*E.N.C.*, 384 S.W.3d at 808.

6

children to Mother included her affinity for drug users, her failure to obtain stable housing despite TDFPS's presence in her life for about two years, domestic abuse in her marriage, her refusal to put the children first, her codependency, and her failure to follow through with tasks and goals until she completed them successfully.

### Drugs

Father's drug use and domestic violence triggered TDFPS's intervention. After investigating a referral based on Daughter's bruised head and allegations of Father's drug use, TDFPS determined that there was reason to believe that Father had physically neglected and engaged in neglectful supervision of the children. It was unknown at the time of the referral whether Mother knew about Father's drug use and whether she was sufficiently protective of the children.

Former TDFPS worker Lindsey Miller worked with the family about six months in Family-Based Safety Services (FBSS). Father denied drug use until near the end of the six-month period. Mother finally left him. Then Father called Miller and told her that he had been clean a few months but that before getting clean, he had used methamphetamine every day for years. Mother told Miller that she did not know about Father's drug problem. Miller testified that Mother never believed that Father was using drugs at any time he tested positive during the FBSS case. Mother confirmed that she never believed Father was using drugs until he confessed, despite the positive drug test results. Miller testified that even after Mother knew that Father had tested positive for

7

methamphetamine and after TDFPS had asked her not to leave children in his care, she did. But Mother denied leaving the children with Father.

After she left Father, Mother immediately moved in with C.L. But Father told Miller that C.L. had been his methamphetamine dealer and that they had used drugs together. Miller testified that she had no reason to doubt Father when he told her that C.L. had been his drug dealer because by that time, he had become more honest about his own drug use. Miller admitted that Mother had left Father for C.L. before he told Miller that C.L. was his dealer. But Mother admitted in her testimony that Father had introduced her to C.L. C.L. and a male member of her household, who had introduced her to Father, both tested positive for methamphetamine during the investigation. C.L. continued to test positive for methamphetamine after the children were removed from their parents. Caseworker Amanda Gray testified that C.L.'s drug test results for April 2014 were treated as positive because she brought urine to the test and that she tested positive for methamphetamine and amphetamines in January 2015. Her April 2015 test and her test on May 4, 2015, just days before trial, however, were both negative. Mother denied that C.L. had brought urine to one of the tests and testified that C.L.'s actual positive tests for methamphetamine resulted from her taking morphine prescribed for a medical condition. C.L. denied using illegal drugs, other than trying marijuana at the age of twelve, denied dealing drugs to Father, and denied taking urine to one of her drug tests. Gray testified that she did not believe that C.L. had been honest with TDFPS about her drug use.

8

Miller never believed that Mother was completely truthful on any issue. Mother, knowing that TDFPS wanted her to leave C.L.'s home because of the positive drug tests of C.L. and a roommate, told Miller that she was staying in a hotel, but Daughter said that they had stayed in C.L.'s car and house. Friends of Mother also told Miller that Mother stayed with C.L.

Miller also did not believe that there was any way Mother could not have known that Father was a daily user of methamphetamine. Mother testified that she thought Father was just taking his bipolar medication until he finally confessed that he was using methamphetamine. She testified that she had not realized he was taking methamphetamine because she had never been around drugs and did not know the behavioral signs to look for. She also stated that his behavior did not change for the worse until about a year before TDFPS got involved with the family.

Miller also never believed that Mother put the children's welfare and safety first. What Mother wanted to do and who she wanted to be with were more important to her. Miller testified that she suggested that it would be in the children's best interest for Mother to leave C.L., but Mother told Miller that C.L. did not use drugs (despite her positive drug tests), so TDFPS should not be concerned. Miller also told Mother that she could lose the children if she did not leave C.L. Miller testified that she believed that the case remained open and active because Mother continued to put other people before the children.

9

**No Stable Home**

By the time of trial, Mother had still not obtained stable housing despite about two years of TDFPS involvement. She admitted that the children's ad litem and TDFPS personnel had talked to her several times about establishing a home for the children and herself independently of anyone else. But the three possible homes she listed in her testimony had already been rejected by TDFPS and were not independent. One potential home she offered was an RV trailer outside the home of Father's former in-laws, D.S. and G.S.; another was the former in-laws' home. The family had lived in the RV when TDFPS first intervened in the family's life. Mother and the children moved out of the RV when she left Father and moved in with C.L. Meanwhile, D.S. kicked Father out after discovering that he had been using illegal drugs and stealing, and TDFPS encouraged Mother to move out of C.L.'s home because of C.L.'s positive drugs tests and also to demonstrate independence.

Mother went back to the RV briefly, but when asked why she did not currently live in the RV "where [she] could live independently on [her] own and show the court that [she had] had housing of [her own]," she testified that she did not want to stay in the RV because the children were not with her. She stated: "I don't feel comfortable being out there by myself without my children. It has too much of my children's stuff out there. . . . It has too many of my children's belongings that just makes me very emotional when I see them."

10

TDFPS had told Mother that the RV was not suitable because the children did not have their own space. Mother moved from the RV to the former in-laws' home, but that home did not have room for the children, according to Mother. Additionally, Gray testified that D.S. and G.S. had history with TDFPS, so their home would not be a suitable living environment for the children.

Mother really wanted to live with the children and C.L. at C.L.'s house. C.L. testified that the children would have their own rooms there, and the house was clean and neat. Mother stayed with C.L. a few nights each week after moving in with Father's former in-laws, and Mother told Gray "[t]hat her ultimate goal was to leave the [in-laws'] home[,] . . . move in with [C.L.,] and raise the children together." Mother told the children that she wanted to live with C.L. and them; she did not ask the children where they wanted to live. Mother did not ever indicate to Gray that she would be willing to put the children above her relationship with C.L. Both Mother and C.L. testified that C.L. would move out and put the house in Mother's name if necessary for Mother to regain possession of the children. C.L. admitted that TDFPS had rejected that offer because there was no guarantee that C.L. would stay away from the home.

Gray had no knowledge of Mother trying to find her own place. Besides living in the RV, with Father's former in-laws, or in C.L.'s home with or without C.L., Mother had no plan for living with the children should they be returned to her. Mother admitted in her testimony that she believed that she needed

11

additional time to "complete[] everything [TDFPS] requested . . . as far as [her] being able to provide a safe and stable environment for [the] children."

### Domestic Violence

Miller testified that domestic abuse was also an issue for the family. Mother had told Miller about Father's abuse and about her worries that he would abuse the children. Mother had also told Miller that the domestic abuse and fear that Father would abuse the children contributed to her decision to leave him. Mother testified that she left Father because of his anger issues, his increased violence, and his drug abuse and also because she was not in love with him anymore; she believed that it was in the children's best interest and hers to be away from him. Mother admitted that Father had mistreated them all. Mother testified that Father had emotionally and verbally abused her for about two years, but "it started to become more physical after [TDFPS] got involved." She testified that Father called her names in the children's presence; she would get away from him and take the children outside with her. Another time, he pulled her hair, but the children did not see it because they were sleeping. Mother testified that the children saw him physically abuse her right before she moved out. She elaborated,

> I told him I was leaving and he got mad. He said he was going to go kill himself. And I told him if that's what he wanted to do, that's fine with me, but don't involve me or my kids. And he needed to go tell his kids goodbye because I wasn't going to do it.

And then he got mad and he threw what he was going to go kill himself with down and he came in there and was begging me to stay. And I told him no, I'm not staying.

He got angry and he hit the wooden poles that hold the shelf up that goes between the shelf and the table in the fifth wheel and broke the boards in half. And a piece of it flew and hit [Daughter] in the back of the head.

But moving away from Father did not remove the threat of violence from Mother's or the children's lives. Miller testified that after Mother moved in with C.L., C.L. told Miller that Father came to her home and became violent. C.L. told Miller that she did not call the police and indicated that she would take care of it herself, implying that she had a gun. Miller thought that resorting to violence with children in the home was inappropriate, and she was concerned about Mother's and C.L.'s choices not to put the children's welfare first.

**Codependence and Failure to Follow Through**

Mother's codependence and failure to follow through with tasks until completion were also issues. Mother was unsuccessfully discharged from individual counseling twice. The counseling notes indicated that Mother did not work on domestic violence issues, Father's drug use and her lack of awareness thereof, or the relationship with C.L. that she began immediately after leaving Father. Mother talked to the counselor about wanting the children back; the counselor encouraged Mother to take action to prove that she wanted the children back. But Gray testified that the counselor was concerned that Mother was not motivated to get the children back. Mother, however, testified that she

completed counseling because the counselor told her that there was nothing more she could help her with. Mother also testified that she addressed domestic violence and codependency issues in counseling.

Gray testified that Mother went from having a home and relationship with Father, a drug user, to living with and having a relationship with C.L., another drug user, "[a]nd has had difficulty making decisions on her own." Mother was still married to Father at the time of trial. She testified that legal aid would not help her obtain a divorce because of the children and the custody issues. She never testified whether she sought other legal counsel. Mother also testified that she completed a cosmetology degree during the case, but she did not take the written or physical examinations necessary to obtaining her license.

Finally, Mother gave a good-size portion of her paycheck every month to C.L. to help her with bills. Mother testified that she believed that she was helping the children and C.L. by doing so "by the simple fact that [she] plan[ned] to move back in with [C.L.] as she and [Mother] are a couple. And [Mother] fe[lt] that the both of [them were] suited to be great parents for the children." Mother admitted that she had continued her relationship with C.L. despite recommendations "from the very beginning of this case to not be in a relationship with [C.L.] given her drug use" and despite knowing that that choice could cost her the children.

Gray testified that TDFPS did not believe Mother could parent successfully at the time of trial and that to her knowledge, Mother had never recognized the drug issues concerning Father or C.L. and had never accepted any responsibility

14

for the children being in foster care. Gray did not believe that the children would be safe with Mother. Gray did not believe that a parent who refused to recognize major problems in the home could protect her children. Gray had concerns about the possibility of placing the children in a home with Mother and C.L. Gray testified,

> Definitely after having a couple of the visits and talking about previous visits with case aids, some of the discipline issues, and then with [Mother] not accepting responsibility for the actions in the case, why the children came into care, drug use on both accounts with [Father] and [C.L.] I don't feel like she's being truthful about the positive drug testing where those substances are coming from and what they are. And all of that exposure to the children.

Gray believed that Mother had endangered the children, had left them in a dangerous environment, and had not corrected her behavior during the case. Mother testified that she did not believe that she or anyone around her was a danger to the children.

**The Children**

Miller testified that the children were very behind both verbally and developmentally when she met them. She believed that they had not been getting the help at home that they needed. She testified that they were sweet but "pretty clingy."

Holly Carchesio, the children's therapist, began seeing them weekly in July 2014, soon after they moved to their third, and current, foster home. They had progressed to needing only monthly therapy by the time of the May 2015 trial. Carchesio testified that Daughter had had negative experiences in previous

15

foster homes. Gray explained that the first foster family had a medical issue not involving the children that required a move. The second home requested a new placement due to some of the behaviors of the children.

The children had problems with sexually acting out. In seeking treatment, the current foster mother had reported that the children had been playing doctor, and Daughter had told Son, "[P]oke me in the butt and take me back." Son also reported that G.S., one of the former in-laws with whom the children had lived with their parents at one point, had touched his privates. Daughter had initially been ambivalent about seeing D.S., G.S.'s husband, who had attended visits, and did not like him hugging her. Carchesio stated that by the time of trial, the children did not want to see G.S. or D.S.

Daughter had told Carchesio that Father had hit her with a stick, a phone, and a board. Son corroborated that Father had hit Daughter with a stick and a phone.

By the time of trial, Daughter's interactions with Carchesio had improved, and she was more talkative during therapy and seemed happy. Son had calmed down. But both children tended to shut down when Carchesio wanted to talk about difficult issues, such as Mother, Father, C.L., and D.S.

The children spoke positively to Carchesio about the foster parents. Likewise, they never spoke of being scared of Mother. But Carchesio, Gray, and the current foster mother all testified that the children suffered some regression after visits with Mother. Gray and the foster mother also indicated that Mother

16

deferred to the foster mother regarding discipline and protecting the children at visits; Mother denied that.

Carchesio testified that the children had increased social skills and were better at listening, following directions, and communicating after being in therapy with her. Gray described Daughter as "very bubbly," "easily excited when talking about horses or her Tae Kwon Do," and "doing very well in school now." Daughter was repeating kindergarten. Gray likewise described Son as "bubbly" but stated that he was more open and outspoken than Daughter. Gray stated that he enjoyed Tae Kwon Do and baseball. She testified that the children were happy at the foster home, received "very" appropriate discipline there, and were loving toward the foster parents.

Gray indicated that the current foster parents would be happy to adopt the children and would consider allowing Mother to see the children. The foster home was appropriate. Gray testified,

> It's a very nice home out on some property where they've got some animals and stuff. Each of the kids has their own bedroom with their own bed. Very open. Very loving home. They definitely give the kids room to play and room to talk about whatever they want to talk about. They definitely have a routine as well.

Gray opined that the foster home would be a stable, safe place for the children and that the foster parents would take care of them and be their family. Mother admitted that when unemployed, she had told her counselor that the children were in good hands with the foster family.

The foster mother testified that the children had lived with her husband and her for ten months. At first, she could not leave the children in a room by themselves because of their sexually acting out. She and her husband sought weekly counseling for the children to allow them "to act more appropriately with each other as brother and sister." At first, Daughter "could barely count past four" and "[d]id not know her ABCs very well." The foster mother worked with her all summer, and at the time of trial, Daughter was one of the top students in her kindergarten class.

Evidence of the children's desires was mixed. The foster mother testified that Son wanted to live with the foster parents and that Daughter wanted "to go home." Carchesio testified that Son went back and forth about whether he wanted to live with Mother or the foster parents. Daughter wanted to live with Mother and told Carchesio that she would be fine living with Mother because she could call her foster parents for help. The children told Carchesio that they would be afraid to live with Mother and C.L., however. The children also did not want to live with Father or D.S. and G.S.

**The Competing Plans**

The foster parents wanted to adopt the children if the birth parents' rights were terminated, but the foster parents were open to continuing communication with Mother in the event of an adoption. There are no other children in the foster home. The foster mother testified that she believed that she and her husband provided a safe, good, strong family environment for the children, they did

activities with the children, they had horses, they supervised the children's studies, and they "hug[ged] and kiss[ed] [the children] at night before bed and . . . t[old] them [that they] love them. [The foster parents did] everything [they could do] to make those kiddos happy."

Mother planned to seek counseling for herself and the children upon their return and would return them to the medical care of the pediatrician they had seen before the removal. She would have C.L. and the former in-laws watch the children when she worked. She said the children had never behaved in a way to make her believe that they feared the former in-laws or C.L., and to her knowledge, G.S. had never touched the children inappropriately. Mother stated that C.L. and D.S. were appropriate caregivers because "they both care[d] for [the] children as much as [Mother]." Mother also testified that the children did not complain about D.S. before moving to the current foster home.

Mother wanted the children to be returned to her so they could finish school. She planned to start a trust fund for their college expenses, and she wanted them to grow up, find the loves of their lives, and "be as happy as [she] and [C.L.]" were. Mother believed that it would be in the children's best interest "to be returned to [her] because they are [her] children. And [she] care[s] for them just as much as anybody else would, if not more. And a family shouldn't be torn apart."

**Analysis**

The evidence showed that Mother was still not in a stable home after two years and lived in a state of denial regarding Father's drug use, C.L.'s drug use, the damage that had been done to her children, her responsibility for that, and what would be required of her to give them a safe, nurturing environment. The evidence also showed that the children had a safe, nurturing environment with foster parents who respected the children's need not to eradicate Mother from their lives. Applying the appropriate standards of review, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of the parent-child relationships between Mother and the children is in the children's best interest. We overrule Mother's third issue.

**Conclusion**

Mother did not challenge the trial court's finding that she failed to comply with the court-ordered service plan that specifically established the actions necessary for her to obtain the return of the children, and we have overruled her challenge to the best interest finding. Because we hold that the evidence is legally and factually sufficient to support the trial court's best interest finding and therefore termination, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED: September 10, 2015

20